IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 34312-0-III |
| | ) | |
| A.M.S. | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| | ) | |

SIDDOWAY, J. — After a 33-month dependency and 4 days provided for trial, the

trial court entered an order terminating the appellant mother's parental rights to her

daughter, A.M.S. The mother appeals the order, arguing the record does not support a

number of the court's findings. The record does support the findings and we affirm.

FACTS AND PROCEDURAL BACKGROUND

At issue are the appellant mother's parental rights to her third child, a daughter

born in February 2012. The Department of Social and Health Services (Department)

became involved with the mother and the father of her two youngest children after

receiving a referral that the couple was using methamphetamine heavily and the mother's

two older children often missed school and were made to lie to their teacher about the

reasons why.[1] When the mother was interviewed by a responding social worker and

---

[1] By the time of trial, the mother's two older children lived with their biological
father and paternal grandfather. The father of A.M.S. (and of the mother's fourth child,
A.M.S.'s younger brother) does not appeal the termination of his parental rights.
A.M.S.'s younger brother is the subject of a different dependency.

police officer on March 20, 2013, she admitted to drug use and that she and A.M.S.'s father regularly fought. Interviewed at school the same day, the mother's two older children confirmed that they witnessed fighting in the home.

The next day, family members participated in a department–convened team decision meeting to determine if the mother's case would be voluntary or a dependency. The mother admitted that violence occurred in front of the children and she claimed to be afraid of the father. She agreed at the meeting to obtain a restraining order against him and to participate in substance abuse treatment.

Despite her agreement, she was seen in a car with A.M.S.'s father only five days later by a social worker familiar with the case. The social worker confronted them and demanded that they go to department offices immediately. There, the mother admitted she had dropped the restraining order against A.M.S.'s father the day before. In light of the mother's intentional violation of the agreed safety plan, the Department filed a petition for dependency. On June 7, 2013, the court found A.M.S. dependent. She was placed in foster care. The mother was ordered to complete a chemical dependency assessment, complete a domestic violence assessment, follow all treatment recommendations, provide random urinalysis (UAs), and participate in individual parenting instruction.

A chemical dependency assessment of the mother performed by Serenity Point Counseling Services (Serenity Point) resulted in an initial recommendation of inpatient

2

treatment, but she would have to wait for a bed to become available. Upon learning that the mother was several months pregnant, Serenity Point changed its recommendation to intensive outpatient treatment, which began in mid-May 2013. Because she was compliant and according to Patrick Flores, Serenity Point's program manager, did "very well," the provider revised its recommendation and kept her in outpatient treatment. Report of Proceedings (RP) at 105. She completed intensive outpatient treatment on July 23, 2013, and completed continuing care on December 30, 2013. Of 27 urine drug screens the mother provided through the end of May 2015, only one came back positive.

The dependency order's requirement for a domestic violence assessment contemplated it would be performed by Woody Koenig, but as of June 2013, Mr. Koenig was no longer under contract to provide services for the Department. According to the originally-assigned social worker, Loni Conklin, "we were kind of in limbo at that time for a couple of months." RP at 190. Nancy Riggle began providing the parents with in-home parenting skills instruction in June 2013 and Ms. Conklin asked Ms. Riggle to incorporate anger management and domestic violence treatment until the Department found a new domestic violence treatment provider. The mother began counseling with Regina Eilertson in July 2013, identifying her objective for counseling as learning to manage her emotional volatility and improve her relationships with A.M.S.'s father and others.

3

Then, in August 2013, the couple met the criteria for participating in a new family treatment court program offered in Walla Walla County. Oversight of a dependency accepted in the program is transferred from a department social worker to a family treatment court team, with the objective of more closely overseeing the parents' treatment and compliance, and thereby expediting reunification with their children. The mother began meeting weekly with treatment coordinator Jon Cassetto and approximately every two weeks with Megan Millar, who served as her primary social worker. The original service plan remained in place but Ms. Millar arranged additional services.

By October 2013, the Department had contracted with Stan Woody, a certified domestic violence treatment counselor located in the Tri-Cities, and both parents completed domestic violence evaluations with him. The mother was determined to be both a victim and a perpetrator of domestic violence. Mr. Woody recommended in October and November that both parents participate in a 52-week perpetrator treatment program in the Tri-Cities but it proved not to be feasible. The father had by then been admitted to a full-time GED[2] program and the mother was 7 months pregnant. Moreover, because the couple had been making progress, A.M.S. and the mother's two older children were returned to her home in mid-November. Between caring for the children and all the other services the couple was engaged in, it was not possible for them to have

---

[2] General education diploma.

4

twice a week treatment in the Tri-Cities, an hour's drive from their home in College Place.

Instead, Ms. Millar asked Ms. Riggle and Ms. Eilertson to continue addressing domestic violence issues in their work with the mother. In November 2013 the Department also engaged Kip Reese, a mental health counselor, to provide couples' counseling and de-escalation skills training, as well as to be on call for crisis management.

Ms. Riggle continued providing services until December 10, 2013, at which point services were terminated because she did not believe the couple was making progress. The mother gave birth to A.M.S.'s younger brother in late December 2013.

Mr. Reese continued to provide couples' counseling until February 2014 and regarded his efforts as largely unsuccessful. He described the "overall trend" of the course of treatment as being that the fighting did not stop, and when it happened it was intense. RP at 163. He described the parents as making only "baby steps." *Id.*

In February 2014, the family treatment court team learned that law enforcement had responded to a report of yelling at the family home. The team required the parents to write about what they wished to happen if the children were removed again, as a way of driving home the importance of ending the pattern of domestic violence.

Another police report of domestic violence in the household was made in May 2014, leading to a decision-making meeting with the family treatment court team.

5

During the course of the meeting, the couple argued intensely, with A.M.S. present, ending only when the father stormed out. The team concluded the mother needed to separate from the father not only to protect the children from exposure to such violence but also because the father had stopped participating in drug treatment at Serenity Point and tested positive for meth. The mother was believed to be in recovery, and the father's use was putting her recovery at risk.

The father was terminated from family treatment court in or about June 2014. When the mother refused to abide by the recommendation that she stay away from him, she was terminated from family treatment court at the end of July 2014. At the time, she was still receiving counseling from Ms. Eilertson.

On September 15, 2014, Ms. Millar learned from the father that A.M.S. had been slightly injured the day before when, during a fight between the parents, the father inadvertently kicked or pushed a highchair, which struck A.M.S. in the foot. He also reported that the mother was drinking again, their fighting had increased, and sometime in the prior month, A.M.S.'s younger brother had been slightly injured when the mother opened a door, hitting the infant's head. At that point, Ms. Millar checked with the College Place Police Department, which reported having been called out to the home three other times within the preceding months: on July 2, July 28, and on August 29, the day A.M.S.'s younger brother was hurt.

6

After receiving this information, the Department removed all of the mother's children from her home a second time. According to Ms. Millar, on a "risk of lethality" scale, the couple exhibited four of six indicators of risk for a lethal injury: obsessive jealousy and control, escalating violence, unemployment, and lack of consequences for continued domestic violence. RP at 224. The children were returned to the foster family with whom A.M.S. had lived before. The foster mother had maintained a relationship with the birth mother, babysitting A.M.S. and her brother occasionally at the mother's request.

Following removal of the children, the mother admitted to one department employee that she had begun using meth again in February, after her son was born, and admitted to another that she had been using again since at least April. She said her use had not been detected through UAs because she "was able to time it so she didn't get caught." RP at 350.

At a dependency review hearing held on October 13, 2014, the mother was found for the first time to be out of compliance with the dependency order and as failing to make progress toward the problems that necessitated A.M.S.'s placement outside the home. She was ordered to continue counseling, demonstrate a recovery lifestyle, refrain from contacting the father, and complete the recommended perpetrator's treatment with Mr. Woody. Her referral to Ms. Eilertson for counseling had expired and she began seeing a new counselor, Elisa Richards. Although the mother initially attended

counseling with Ms. Richards twice a month, she began to attend less regularly in March 2015.

The mother returned to Serenity Point for intensive outpatient treatment in October 2014. She also obtained a restraining order against the father, but she dropped it in late October, informing department personnel that she and the father intended to stay together. Both parents began the domestic violence perpetrator's treatment with Mr. Woody in November 2014. By early 2015, the father had stopped attending.

In early November 2014, the mother's case was transferred from Ms. Millar back to Janel Torrescano, to whom it had initially been assigned.

In January 2015, Ms. Torrescano received a letter from Serenity Point saying that the mother's progress for December had been minimal. And in March 2015, A.M.S.'s pediatrician, who had also provided care to the mother as a child, wrote to Ms. Torrescano to strongly urge her to move forward to terminate the mother's parental rights so that A.M.S. could be adopted by her foster parents. The letter expressed the doctor's opinion that it was "cruel and detrimental to [A.M.S.'s] mental health to wait two years in limbo without a permanent home" and that A.M.S. "is cleaner, calmer, happier and healthier when I see her with her foster parent than when I see her with her birth mother." Ex. 1.

At the dependency review hearings that took place on March 16, 2015 and August 31, 2015, the mother was found to be in partial compliance with the court's orders, but was again found to be failing to make progress correcting her parenting problems.

The mother stopped attending group meetings at Serenity Point in June 2015 and was discharged on July 31, 2015, for aborting treatment. Ms. Torrescano learned of the mother's failure to attend in July and also learned that unbeknownst to the Department, the mother had stopped calling in for random UAs in February. The mother submitted to her last drug screen on July 15, which tested positive for hydrocodone.[3]

On July 16, 2015, the Department petitioned for termination of the mother's parental rights to A.M.S.

Although the mother had stopped attending treatment at Serenity Point, the Department's required random UAs were still to be provided through that location. The mother began calling in as required for random UAs in August but soon quit. Her last appearance for a urine screen was on September 3, 2015.

Although Ms. Richards reported to the Department that the mother presented as depressed much of the time, the mother's counseling attendance was irregular in 2015 and her last reported session with Ms. Richards was in November 2015.

---

[3] The mother provided Serenity Point with an undated prescription for hydrocodone. Lacking a date, Mr. Flores testified that he had no way of knowing whether her use of hydrocodone in July was prescribed.

The mother last attended perpetrator treatment with Stan Woody in mid-November 2015. During the year she participated in the treatment, her attendance was very sporadic; according to Mr. Woody's records, she attended 30 groups but had 20 absences.

*Termination trial*

The termination of parental rights trial began with the testimony of a single witness on October 23, 2015, and was then recessed due to a conflict between the mother and her lawyer. The mother participated in almost no visitation with A.M.S. in December 2015 or January and February 2016, despite Ms. Torrescano's attempts to arrange visitation.

The termination trial continued for three days in late February 2016. By that time, A.M.S., then four years old, had lived with her foster family for almost two years. The service providers testified consistently that the mother still needed chemical dependency treatment, more counseling and domestic violence treatment.

Mr. Woody testified that the mother had missed core assignments and would have to start domestic violence treatment over again. He believed she could complete the treatment in another 26 weeks, but only if she was consistent, which she had not been in the past.

Ms. Eilertson estimated the mother needed another six months' worth of counseling with someone with whom she had an established relationship.

10

Ms. Torrescano testified that in her own interactions with the mother, she had not seen progress during the dependency. She lacked confidence that the mother was then capable of being in a healthy relationship with anyone. Before she would feel confident recommending a return of A.M.S. to the mother, Ms. Torrescano testified she would need to see completion of an inpatient treatment plan of at least six months to a year and another six months of stability thereafter—meaning no domestic violence or high conflict relationships, an ability to cope with her emotions, and consistency participating in services and visitation.

Ms. Millar testified that at the time she left the case, she would have wanted to see the mother complete the 52 weeks of perpetrator's treatment, 6 months to a year of inpatient chemical dependency treatment, and another 6 months of stability before A.M.S. was returned to her mother's home.

Margaret Buchan, who had served as A.M.S.'s court appointed special advocate (CASA) since the inception of the dependency and was later appointed as CASA for A.M.S.'s younger brother, testified to her opinion that it was in A.M.S.'s best interest for the mother's parental rights to be terminated and for her to be adopted by her foster family.

The mother contested termination, testifying that she had ended her relationship with A.M.S.'s father a year before (although acknowledging that she had seen him again in July 2015 and they had fought). She testified that car trouble, depression and difficulty

11

getting gas vouchers from Ms. Torrescano had caused her to miss a number of appointments with Mr. Woody but she "plan[ned] to go back" and thought she could finish his treatment program in two months. RP at 452. She testified she now believed she had always needed inpatient treatment for her alcohol and methamphetamine abuse and was "looking into a women's/child program" that involved a 30-day assessment. RP at 463. She admitted that she had not been seeing Ms. Richards as regularly as ordered by the Department but claimed that Ms. Richards shared responsibility for cancellations. She said she planned to "keep [on] working" with Ms. Richards. RP at 465. She admitted that she had not been doing random UAs because Ms. Torrescano was skeptical about their reliability and "I don't see the point." RP at 512. She admitted she had not contacted Ms. Torrescano for two months because she felt that she was not supportive.

At the conclusion of the evidence and argument, the trial court announced from the bench that it was making the statutory findings required to terminate the mother's parental rights. A written order terminating her parental rights was entered on March 28, 2016. The mother appeals.

## ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a

12

fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful [of] reasons.'" *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington statutes respond to this constitutional command by providing a two-step process before a court may terminate parental rights. The first step requires that the State prove six statutory elements, the first three of which are procedural and are seldom in dispute.[4] Where a termination decision is appealed, it is the State's proof of the remaining elements that are most often challenged—those being its burden of proving

> [t]hat the services ordered [to be provided to the parent] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided[,]

RCW 13.34.180(d);

> [t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future[,]

---

[4] The three rarely disputed elements appear at RCW 13.34.180(1)(a)-(c) and provide:
   (a) That the child has been found to be a dependent child;
   (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
   (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency.

RCW 13.34.180(1)(e); and

> [t]hat continuation of the parent and child relationship clearly diminishes
> the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(f).

This first step "focuses on the adequacy of the parents and must be proved by clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010) (footnote omitted). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). In addition to finding the six statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48). This finding need not be made explicitly and satisfying all six of the statutory elements raises an implied finding of parental unfitness. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 479, 379 P.3d 75 (2016).

The second step is for the court to ascertain the best interests of the child. RCW 13.34.190(1)(b). "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

In this case, the mother argues that the Department did not provide her with all necessary services; it failed to prove that reunification with A.M.S. could not happen in the near future, and the trial court erred when it found her currently unfit to parent A.M.S. and that termination of the mother's parental rights was in A.M.S.'s best interest.

In reviewing a trial court's decision to terminate parental rights, we will uphold its factual findings "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *K.S.C.*, 137 Wn.2d at 925. "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *K.M.M.*, 186 Wn.2d at 477 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence. *Id.* We review de novo whether the trial court's findings of fact support its conclusions of law. *Id.*

We address the mother's challenges in turn.

### I.  Sufficiency of the evidence to demonstrate the State's offer or provision of necessary services

The State's burden of proving it offered "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future" requires proof that it offered services "tailored to each individual's needs." *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). While the legislature

15

has not defined "necessary services," case law has defined the term to mean "those services 'needed to address a condition that precludes reunification of the parent and child.'" *K.M.M.*, 186 Wn.2d at 480 (quoting *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014)).

The mother argues that the Department failed to provide all necessary services because it did not offer inpatient substance abuse treatment or provide domestic violence treatment in a timely manner.

### Inpatient substance abuse treatment

The dependency order required the mother to "[c]omplete a chemical dependency assessment and successfully complete all recommendations by Serenity Point or other approved provider." Ex. 2 at 11. The court-ordered assessment was performed at the outset of the dependency. While Serenity Point originally recommended inpatient treatment, it revised its recommendation because there would be a waiting period; the mother's pregnancy presented some urgency; and later, because its personnel believed she was doing very well with outpatient treatment.

As the mother herself testified, it was "Serenity Point" who "made the decision for [her] not to go to inpatient treatment." RP at 467. In questioning by her lawyer, she elaborated:

Q  So there was never, to your knowledge, any recommendation for inpatient?
A  Through them?  Yes, there was.

16

Q   When did that happen?
A   Two different assessments that has happened.
Q   Okay.
A   The first assessment when [A.M.S.] was taken in 2013.  And because I was pregnant with [my son], I couldn't go.  They said we have to get you in IOP right away.  There is a liability issue to wait around for inpatient.
Q   So to clarify, you are saying there was a recommendation for inpatient, but the recommendation was overridden—
A   Correct.
Q   —based on the situation?
A   Yes.
Q   And you went along with it—
A   Yeah.
Q   —because you are an addict?
A   No.  Not just that reason.  I mean—Okay.  I mean, they are going to let me do treatment here.
Q   Seemed like a reasonable solution to you?
A   Right.  Especially with that one.  I mean, both of them.  I don't know, really.  I was so willing and honest in 2014, as well with my assessment that I thought that IOP services could help.

RP at 467-68.

Even after she relapsed and returned for more treatment, she testified that it was

Serenity Point that again offered intensive outpatient treatment as an option.  As she

explained:

Every time I have had intake appointments with them, they sit down with me and they give me the option for IOP, even this last time.  And I have talked to Pat when I tested positive for the prescription drug, and told him I was getting a job at Sykes and all that and what the recommendation was. He had a phone conversation with me and he told me they were willing to work with me and they will do IOP again.

RP at 467.

Now, having failed to recover with outpatient treatment, she contends that inpatient treatment must have been the necessary service. But as she herself testified, it is the Serenity Point personnel who "are the provider":

> They are the ones that are educated in this. And they never just said, no, you are not going to have an option for IOP. You need to go.
> And, of course, an addict doesn't necessarily always want to go to inpatient. It's scary. It's hard. It's all those things, I mean. And they always gave me the option to stay and so I did. And I can see my kids. And it's just that is how it worked out every time.

RP at 465-66. Asked if the family treatment court team was involved in the decision to substitute outpatient care, she testified that it was never a team decision; rather, "I have always talked with Andrea Dressler about that." RP at 466. Ms. Dressler is Serenity Point's inpatient case manager. *See* Ex. 6 at 2.

Ms. Torrescano testified that she did not know why Serenity Point gave the mother the option of doing intensive outpatient, but that they, not her, were the certified chemical dependency experts and she would expect the court to go along with their recommendation. She was also aware from conversations with the mother that the mother preferred outpatient treatment so that she could "stay in the community," "continue frequent visits with her kids and remain in her home." RP at 351. The mother does not assign error to the trial court's finding that "[t]he mother insisted on doing outpatient treatment, rather than the inpatient program Serenity Point initially screened her in for." Clerk's Papers (CP) at 92-93.

18

The trial court found that the Department "offered the following services clearly and understandably . . . [p]articipate in drug and alcohol treatment assessments and any recommended treatment." CP at 86-87. Substantial evidence supports the finding that the Department offered the assessments and honored Serenity Point's recommendations. There is no evidence that department personnel overrode treatment recommendations, as the mother implies.

*Domestic violence treatment*

RCW 13.34.180(d) does not literally require the Department to "timely" offer necessary services. But it does limit necessary services to those "capable of correcting the parental deficiencies within the foreseeable future." And RCW 13.34.180(1)(e) authorizes the termination of parental rights where "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." So timeliness matters where it can be shown that early services could have corrected parental deficiencies or remedied conditions in time for the child to be returned, but the Department offered services too late for the parent to demonstrate correction and remediation at the termination trial.

Timeliness did not make that difference here. Assessment was delayed for a few months because no qualified provider was under contract. Treatment by a fully qualified provider was delayed for a year because it was not feasible in November 2013 for the mother—with three children in the home, another on the way, and other service

19

commitments—to travel two hours to the Tri-Cities for weekly treatment. But by November 2014, with no children at home, it was feasible for her to begin a 52-week treatment program, which could have been completed before the termination trial. The treatment was not completed because the mother was inconsistent in her participation— so inconsistent that Mr. Woody testified she would have to start over.

It is well settled that the statutory requirement to offer or provide corrective services does not contemplate an entirely one-way process, and "a parent's unwillingness or inability to make use of the services provided excuses the State from offering extra services that might have been helpful." *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) (citing *In re Welfare of Ferguson*, 41 Wn. App. 1, 6, 701 P.2d 513 (1985)).

*II.  Sufficiency of evidence to support the court's finding that there is little likelihood that conditions will be remedied in the near future*

"While RCW 13.34.180(1)(d) looks specifically at a parent's deficiencies, RCW 13.34.180(1)(e) more broadly requires '[t]hat there is little likelihood that *conditions* will be remedied so that the child can be returned to the parent in the near future.'" *K.M.M.*, 186 Wn.2d at 490 (alteration in original). "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." *In re Dependency of T.L.G.*, 126 Wn. App. 181, 204, 108 P.3d 156 (2005). The younger the child, the shorter the "foreseeable future" will be. *Hall*, 99 Wn.2d at 850-51 (8 months

20

was not in the foreseeable future of a 4-year-old); *In re A.W.*, 53 Wn. App. 22, 31-33, 765 P.2d 307 (1988) (1 year was not in the foreseeable future of a 3-year-old); *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990) (6 months was not in the foreseeable future of a 15-month-old).

If the State offers or provides all necessary services reasonably capable of correcting parental deficiencies within the foreseeable future and the parent does not substantially improve within a year of the dependency order, a presumption arises that the State has demonstrated RCW 13.34.180(1)(e)'s requirement that there is little likelihood conditions will be remedied so that the child can be returned to the parent in the near future. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). "A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the [Department] has satisfied RCW 13.34.180(1)(e)." *Id.*

The presumption applies here, because the Department offered all necessary services and the mother did not correct her deficiencies in the 33 months following entry of the dependency order. Yet she argues that the presumption was rebutted because she ended her relationship with A.M.S.'s father, A.M.S. would not have been harmed by remaining in foster care for the six months it would take for the mother to complete inpatient drug treatment, and any required domestic violence treatment could be completed after reunification.

The trial court did not accept the mother's "best case" prognosis for when A.M.S. could be returned to her care. It found that the mother would need "at least an additional one to one-and-a-half years of perfect compliance with the current service plan, in addition to demonstrating actual progress and lifestyle changes" before she could be considered a fit parent. CP at 93. The time frame found by the court falls within the range testified to by providers. Given the mother's failure to remedy conditions for almost three years with and without her children at home, the trial court's finding is tenable and entitled to deference.

### III. Current unfitness

"[A] parent has a due process right not to have the State terminate his or her relationship with a natural child in the absence of an express or implied finding that he or she, at the time of trial, is currently unfit to parent the child." *A.B.*, 168 Wn.2d at 918. As earlier noted, proof of the six statutory elements by clear, cogent and convincing evidence satisfies the requirement of due process that a parent be found currently unfit before terminating the parent-child relationship. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011).

Nonetheless, citing cases from other jurisdictions, the mother argues that drug abuse alone is an insufficient basis for finding a parent unfit; there must be some nexus between the drug use and harm to the child. She also characterizes the evidence of her domestic violence as limited to her relationship with A.M.S.'s father and argues that any

22

unfitness attributable to domestic violence terminated when that relationship terminated. While couched in "current unfitness" terms, these arguments are implicitly a second attack on the finding, required by RCW 13.34.180(1)(e), that A.M.S. cannot be returned to the mother in the near future.

Both arguments minimize the magnitude of the State's evidence of the mother's problems with substance abuse and domestic violence.

The trial court was presented with evidence that the mother's emotional volatility has a long history—one that is not confined to her relationship with A.M.S.'s father. The initial referral of the parents to the Department was based on concerns about the mother's older children raised by personnel at their school, and characterized the mother as being "verbally aggressive with [school] staff over the phone." CP at 2. The referent was worried that the mother "was so belligerent with staff." *Id.* When social worker Veronica Sandau went to the mother's home in March 2013 (with law enforcement backup) to deliver A.M.S. to foster care, both the mother and the maternal grandmother screamed and yelled; the maternal grandmother even called Ms. Sandau a "spic." RP at 154. Ms. Eilertson testified that the mother wanted to work on managing her emotions and improving her "relationships" (plural), explaining that the mother would have fights and arguments, and "[a]t times the people that she was engaging with would have to leave the home or she would have to leave the home to cool off." RP at 66.

23

Dr. Alison Kirby, who had been the family physician when the mother was a teen, testified that she saw "warning signs" in the mother then: "She was struggling. She was angry. She was running away from home. She attempted suicide. She was using meth. She was having high risk behaviors." RP at 41. She saw the mother as "feeling so abandoned when [she was] young and so angry and so frightened and jealous." *Id.* Dr. Kirby recalled that the mother had been charged with assaulting A.M.S.'s father's ex-wife in a bar, an incident that the father also mentioned to police investigating a domestic violence call in 2012. Among exhibits admitted at trial was a collection of police reports of domestic violence calls that included 13 involving the mother between May 2012 and January 2015. One involved her getting drunk and breaking a television set that A.M.S.'s father had just retrieved from pawn. Six of the calls had taken place during the period of the dependency.

The trial court found that even as recently as November 2015, the mother had been "explosive, and apparently unable to control her emotions" in an altercation with a visitation supervisor, "demonstrating that, despite nearly three years of services designed to address these issues, the mother still had made little to no progress addressing her emotional volatility and control." CP at 92.

Perhaps the trial court was skeptical about whether the mother had permanently ended the relationship with A.M.S.'s father, since she had claimed she was ending it, only to revive it, many times before. As she points out, however, the trial court made no

24

finding that the couple was still together. Even if that relationship was over, however, the mother's problems with emotional volatility and control affected her dealings with other people and remained untreated.

As for substance abuse, the mother was not a person who merely silently struggled with drug addiction; by her own admission, "drug abuse is why there was domestic violence." RP at 451. She testified that it was because of drug abuse that the domestic violence "became so volatile, so to speak, which it was." *Id.*

Dr. Kirby and Mr. Reese both testified that exposure to domestic violence has severe and long-term consequences for children's development. The evidence supports the trial court's finding of current unfitness.[5]

---

[5] In addressing the issue of unfitness, the mother challenges two of the trial court's findings of specific facts as unsupported by the evidence: its finding that law enforcement was called to the home in February 2014 due to domestic violence and its finding that in November 2014 the parents continued to engage in heated arguments in front of the children. Br. of Appellant at 1 (citing Findings of Fact 2.3(e)(41) and 2.3(e)(52)). The mother argues that the first finding was based on hearsay from Ms. Millar, but no objection was raised to the testimony, which arose in the context of explaining the parents' eventual termination from family treatment court. She argues that the second finding misstates Ms. Torrescano's testimony that she arranged for the parents' separate visitation with A.M.S. because of arguments that had taken place in front of the children *before* November 2014. As the State points out, there is evidence of the mother fighting in front of the children with a visitation supervisor, if not with the father, after November 2014.

The substance of both findings has some support in the record. Considering the trial court's findings as a whole, neither is important.

### IV. Best interest of the child

Finally, the mother challenges the trial court's finding, as the second step in its decision, that terminating her rights is in the best interest of A.M.S. As earlier observed, the State is required to prove the best interest of the child only by a preponderance of the evidence. The mother argues that even if the Department established all six statutory factors, termination was not in A.M.S.'s best interest because she and A.M.S. still love each other and the benefit of termination does not outweigh the harm of severing their bond.

Whether termination of parental rights is in the best interest of the child is a fact specific inquiry. *In re Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" *T.R.*, 108 Wn. App. at 167 (alterations in original) (quoting *A.W.*, 53 Wn. App. at 33).

Dr. Kirby was sufficiently concerned about A.M.S.'s need for permanence with her foster family to write an unsolicited letter to the Department, urging it to "choose permanent placement for [A.M.S.] as soon as possible." Ex. 1. Ms. Buchan, who as the CASA visited A.M.S. every month during the 33-month dependency, testified that A.M.S. and her little brother are loving siblings, that it was in their best interest to stay

together, and that they were in a good and loving foster home that they had lived in for much of their lives—for A.M.S.'s little brother, for *most* of his life. She testified, as did A.M.S.'s foster mother, that with the passage of time, A.M.S. began to resist visitation with her mother. It could be difficult to get her into the car for visitation, and A.M.S. exhibited anxiety before and after the visits.

The evidence established that the mother essentially stopped participating in visitation after November 2015 and the foster mother testified that thereafter, A.M.S. relaxed and exhibited less anxiety. All of this is substantial evidence supporting the finding that termination of the mother's parental rights was in A.M.S.'s best interest.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.

27